EMILY SCHULTZE

*v.*

FREDERICK A. G. SCHULTZE.

[Decided May 28th, 1907.]

Defendant, after divorce because of his adultery, married his paramour, and his three children were awarded to the custody of the mother, defendant being directed to pay her alimony, which he did intermittently.— *Held,* that while the order might be modified to allow a boy, after arriving at the age of sixteen, at his request, to go with his father, the other two children, a girl of fourteen and a boy of ten, would be allowed to remain in the care of the mother.

On petition of defendant for custody of children and order to show cause and affidavits on each side.

*Mr. James D. Carton,* for the complainant.

*Mr. James W. Miller,* for the defendant, petitioner.

PITNEY, V. C. (orally).

The girl is fifteen years old; she is of an age to choose for herself. I have talked with her privately; I have seen her, and I shall decline positively to make any order with regard to her. That ends that. If she chooses to go with her father she can go. I know about the case. I think that it is very likely that the second Mrs. Schultze is a very decent woman, in a way, as decent as such a woman can be with the history that I know of her. I mean the second Mrs. Schultze. But I shall positively decline to make any order with regard to the girl.

I will hear you farther, if you, Mr. Miller, have anything to suggest about the boy. I have examined him privately and find he does not wish to leave his mother and go with his father. The affidavits of the defendant show that—if there is any reliance upon human evidence—this woman is bringing up her children properly, as well as she can on the scanty means she has, and the children both go to school. Their teachers say they stand high in their classes. You have read the affidavits, I suppose. The court looks entirely to the welfare of the children. That is as thoroughly settled as anything in the State of New Jersey can be. When it comes to ordering as to the custody of a girl fifteen years old you come into a different atmosphere and a different line of law entirely. When a child passes fourteen the general rule is they have a choice as to the guardianship and custody, and I positively decline to make any order now, once for all, with regard to the girl.

I will hear you about the boy. If the girl chooses to go with her father I have nothing to say; but she don't, doesn't want to go with him; she doesn't want to go and be under the control of his wife, and I certainly honor her for it.

(Mr. Miller, on behalf of the defendant, petitioner, was here heard at length.)

PITNEY, V. C.

This case stands in this wise. The petitioner, Mrs. Schultze, Mrs. Emily Schultze, and the defendant were married a great many years ago, and had three children. They were then very

poor. They are all foreigners. I believe the husband was unable, at one time, to earn anything for his living, for at the trial of this cause the petitioner produced letters from her husband to her in which he begged her to sing in ordinary saloons or anywhere, to get money to pay living expenses, to pay money to him in order to live. She was a devoted wife. I do not say that he was not an industrious man, trying to do the best he could. But she was a devoted wife. They had three children; a boy, a girl and a boy. Finally he got a position as immigrant agent for the New York Central railroad, or some other railroad, whose business was at Hoboken. He went to live there.

Now, the present Mrs. Schultze was not, at that time, a good housewife. She did the best she could. She was a musical character, and she was not what you call a business man's wife, and, perhaps, she didn't keep things as tidy about the house and her children as she would desire to do. But, be that as it may, about that time the husband became infatuated with Miss Meyer, and neglected his wife, and stayed away and ran with this Miss Meyer, lived with her in an apartment over in New York City until his wife hunted him up and ran him down, and caught him in the act, so to speak.

He was spending his money on this other woman and was neglecting his family. These are solid facts that were proven before me at the hearing on the merits.

She then brought a suit for divorce against him on the ground of adultery, and the case was proven beyond all peradventure, although both the defendants, Mr. Schultze and Miss Meyer, swore point blank that there never had been any improper conduct between them. Well, that is quite usual, but it doesn't show a very high moral tone on the part of either.

Now, I granted a divorce. In the meantime these children were in the custody of the father, with the privilege to the mother to see them. That privilege was exercised in such a manner, on the part of the husband, that she did not get a fair chance to see them. But he went out to East Orange, or somewhere there, or South Orange, somewhere there, and rented a house and lived with this Miss Meyer, and had his three children there in the same house with her. And poor Mrs. Schultze went

and took board or rooms in a house, the rear of which backed up on the rear of the house in which her husband was living, so that she could see and watch her children playing in the back yard.

Now, that was all proved to my satisfaction; his sister's house, I believe, was the place where, by order of the court, she should go and see her children once a week. It was a mere mockery, the chance she had to see them, unless she went to this house and saw them there in the custody of her husband's mistress.

This was pending suit.

Now, after I pronounced a decree of divorce in favor of Mrs. Schultze, against her husband, the question arose as to the custody of those children. They were much younger than they are now. That was seven years or more ago. The oldest boy, I think, was but nine years old then, the girl seven, then the little fellow there was a boy two or three years old.

I had an interview with them. They didn't want to go with their mother; they wanted to stay with their father. There, of course, was a case of influence. But I made up my mind I would never commit those children to the care of a man who was living in open adultery with a woman, and I didn't. I committed them to the care of the mother, and made the father pay the keep of them, and I have never done a thing in my life that I look back upon with more satisfaction than upon that order.

Shortly afterwards, the father married his paramour, and she is his wife to-day. And it is to that home, composed of that father and his former paramour, that I am asked to send these children.

Now, about four years ago, I think it is, an application was made by the father to have the custody of these children taken away from the wife. She went, immediately after the divorce, to live in Ocean Grove; she has been living there ever since, and if there is one place in the State of New Jersey above another, where the children would be brought up in a clean atmosphere, it is Ocean Grove. It is a religious community, no liquor sold there, I believe, or anything of that kind, all good pious

Methodists, Sunday schools and public schools, and everything of the best character. I honored her choice going there.

Well, on the father's application, on that occasion, the children were brought before me at Jersey City and a crowd of witnesses on each side were sworn as to how the mother was taking care of them.

One difficulty that she labored under all the while was that her husband would not pay her alimony regularly; held back her alimony, and she had these three children to support, and that difficulty has been continued ever since, and I will speak of it in a moment.

On that occasion I saw the oldest boy was getting too big for his mother to control, and I gave him to the father. He was then, I think, twelve years old. He was willing to go, and I gave him to the father. I think, probably, I did right then. I have no kind of doubt about it.

You see the situation is such that it is incurable. When a husband and wife are separated in that way the case is one that the court cannot cure. They have only to choose the lesser of the two evils. They cannot put those children where they ought to be, with the care of their own father and mother, living together as man and wife, according to the laws of God and man. It is impossible for the court to cure that disease, and that disease is due to the improper actions of the father. He is the man that is to blame for the present situation, and for the situation as it has been ever since he became infatuated with this Miss Meyer. He is the one that is to blame.

I gave the boy to the father. Probably I did right. I hope I did. But I left the little girl and the other little boy with the mother, and at that time the girl was only eleven years old. I found that she knew enough to know that her father was committing a crime; she knew enough to know that. He was living with the very woman that he lived with in open adultery and that she had lived in the house with, and she did not want to go with her father and gave that as a reason.

They have lived at Ocean Grove ever since, and the father has an order that he should have access to those children. The trouble has been he has not paid his alimony. Time and again

that poor woman has come to me here and has written to me that her husband was behind in his payment. Well, the moment she employed a lawyer she had to pay out money. So in order to save that I undertook myself to try and force that man to be prompt in his payments. He made all sorts of excuses, wanted the amount cut down, and all that sort of thing. I reduced the alimony, though, from twelve, I believe, to ten dollars, something like that, at the time I took the oldest boy away. And it has been one struggle from that time to this to have that man pay his alimony. I have written him, and then he would pay up in part—never would pay up in full. The poor woman would be behind, in debt to the groceryman, doctor, and all that sort of thing, and he all the while refusing to pay. No reason in the world that I could see except pure ugliness. A man that does that kind of thing does not commend himself to the court as the proper person to have the care of a boy to bring up.

Finally, about six months ago, I wrote her to make up a statement, as well as she could, of the arrears, and also a statement of the amount of debts she owed for want of this money. She made it up the best she could and I ordered my clerk to make up affidavits and statements, and he made them up and sent them to her and she swore to them, and then I sent them to a lawyer, Mr. Cook Conkling, near where the defendant lived, to prosecute, and he compelled the defendant to pay what the defendant admitted he owed; it was not as much as the petitioner claimed, and she says, now, she has not been paid in full, but I take it for granted she has.

Now then, in the face of all that he comes in and wants the custody of these children. Now, reading between the lines, I should say the reason why he was behind in paying his alimony was to torment his wife into giving up the children or something like that or of that kind. I cannot think of anything else.

Now, he says he has been denied access to the children, and the wife says in reply that he did not go there very often, went so seldom—Saturday was the day, I think, fixed for seeing the children—they did not think of staying home because the father did not come. He says he went there and was prohibited from seeing them. The wife says that is not so; they did not stay

home because he did not come regularly. But unless he paid his alimony regularly he was not entitled to see those children. It is only when he paid his alimony regularly that he was entitled to see the children; I think Mrs. Schultze might have said, "I won't let you see the children because you don't pay me my alimony; I am starving here for food because you don't send me my ten dollars a week."

Now, that is the situation at this time, and when I made this order to show cause on the husband's petition it was on condition that he should pay all arrears up to that date and should furnish Mrs. Schultze with money to pay counsel and to pay her fare up here to Newark to meet this petition.

Now, as I remarked before, it is impossible for the court to make an order that is satisfactory to the court or to anybody else, and the reason is because this man has deserted his wife and gone off with another woman and rendered himself liable to an action for divorce, and then married his paramour. Now, in that situation there is a sore that the court cannot heal. It must do the best it can.

Now, the girl is fifteen years old. I have examined her, and the affidavits show her to be a good scholar and steady student; she has an ambition to become a teacher, and she wants to live with her mother. It is a good community; it is a good neighborhood, and she is well liked by her teachers and they speak well of her in their affidavits. Why it is simply impossible to think for a moment of ordering that girl into the custody of her father, under the control of a woman who lived in open adultery with her father before he was divorced.

Now, with regard to the boy, the same thing may be said of him. He ought to have a father, of course; it is time he had a father, but how is he going to have one? Whose fault is it that he has not got a father, right along side of his mother, to look after him every day? No fault but his father; the father is the man to blame for that. If the boy was older (I thought he was about twelve years old), but if the boy was older I would seriously consider whether he had not got too big for his mother to control, and would seriously think of turning him over to his father. But he is not; he is not old enough to commence to

learn business; he is not old enough to need the particular kind of instruction that Mr. Miller has very forcibly and very properly urged upon the court, and I am very much obliged to him for it. He has not attained those years yet. He is less than eleven years old; he has not got through his schooling and is not fit to go to work, so to speak. I do not think he ought to be taken away from his mother. There is nothing that can compensate or equal the love of a mother, and when it appears, as in this case, that the mother was first a devoted and true wife and is now a devoted and true mother—she may not be a model mother; she may not be a woman you would set up and say "there, copy her," but so far as she has the capacity she is a true mother of these children, and she is their own mother; she has a mother's affection and a mother's solicitude such as nobody else, except in very exceptional cases, can possibly have.

Now, under these circumstances, I am not ready to-day to make an order that that child should be taken from its mother. He is well situated, he is going on in school, he has his schoolmates, is surrounded by a moral community where he is not exposed to temptation, and, take it altogether, I decline to make an order that the boy should be taken away from his mother.

*Memorandum.*—The father and older brother at once, and in view of the court, interviewed the younger boy and apparently coaxed him to go with them, but without success.

PITNEY, V. C.

Shortly after I had refused, on July 10th, 1906, the application of the defendant for the custody of the two children remaining in the hands of their mother, the defendant applied to me, orally and personally, and, as he said, on new grounds, to renew the application.

I instructed him to take *ex parte* affidavits before any special master of the facts which he said arose since the previous refusal just mentioned, and submit them to me with copies to be served on Mrs. Schultze.

This he did.

The copies were duly served and Mrs. Schultze was directed to take answering affidavits and submit them to me.

This she did and I have considered them all and will file them with the papers in the cause.

It is proper to say that I made personal inquiries of a special master residing in the neighborhood and acquainted with the character of Mrs. Rogers, the principal affiant upon which the defendant relies to sustain his application, and learned from him that she was not a person upon whose unsupported evidence, without an opportunity to cross-examine, it would be safe to rely.

Upon a careful consideration of all these depositions, including my personal familiarity with the parties and the history of the cause from the beginning, I have concluded to make no order. In support of that conclusion I need only say that the allegations of the defendant are not, in my judgment, sustained. The witness in question took advantage of a fortuitous and entirely innocent circumstance to magnify it far beyond reasonable limits.

I will add that I have received one or two letters from the daughter, which show her to be an intelligent and well educated young lady, and disproves any allegation that she has been subjected to improper or noxious influences.